**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARKEL SHAR HOLLMAN, | 1:11-CV-00229 SMS HC |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT AND CLOSE CASE |
| R. GROUNDS, | ORDER DECLINING ISSUANCE OF CERTIFICATE OF APPEALABILITY |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Fresno, following his conviction by jury trial on June 12, 2008, of: torture with great bodily injury (Cal. Penal Code[1] §§ 206, 12022.7); assault with a firearm (§ 245(a)(2)); assault with a deadly weapon with great bodily injury (§§ 245(a)(1), 12022.7); assault with force likely to cause injury (§ 245(a)(1)); and false

---

[1] Unless otherwise noted, code references are to the California Penal Code.

1

imprisonment (§ 236). (See Petition at 2; CT[2] 271, 273.) On December 8, 2008, Petitioner was sentenced to serve an indeterminate term of life with possibility of parole plus seven years. (CT 271, 273.)

Petitioner filed a timely notice of appeal. On January 21, 2010, the California Court of Appeal, Fifth Appellate District ("Fifth DCA"), affirmed Petitioner's judgment in a reasoned decision. (See Petition at 3.) Petitioner then filed a petition for review in the California Supreme Court. The petition was summarily denied on May 12, 2010. (See Petition at 3.)

On February 10, 2011, Petitioner filed the instant federal habeas petition. He presents the following claims for relief: 1) He claims he was denied his federal constitutional rights to due process of law, a full and fair jury trial and confrontation of witness; 2) He claims the trial court abused its discretion by denying the defense permission to contact jurors in order to investigate possible juror misconduct and any impact a witness's cries may have had on the jury; and 3) He alleges the trial court violated his constitutional rights by selecting a sentence based on his failure to plead guilty. On June 7, 2011, Respondent filed an answer to the petition. Respondent filed a first amended answer on June 9, 2011. Petitioner did not file a traverse.

## STATEMENT OF FACTS[3]

Neal was walking in her neighborhood around 1:00 a.m. on June 17, 2007. A silver car pulled up and Jarmaine Doubs and Hollman got out of the car; Hollman ordered Neal to get inside the car. Doubs and Hollman drove Neal to a nearby hospital where Jamal Johnson,[FN1] Doubs's brother, was taken after being shot. Neal was told that her son, Joseph Jynes, was the shooter.

> FN1. Because Jamal and Precious share the same last name, we will refer to them by their first names to avoid any confusion to the reader.

Once Neal was forced to enter the hospital, she was prevented from leaving by various young women who watched her and followed her around, including Precious. Doubs and Hollman told her she could not leave until her son was located. Later, Neal was taken to an apartment complex on North Diana Street and forced to enter apartment 202. The people in the apartment threatened Neal's life and told her she would not be allowed to leave the apartment.

Doubs gave Neal a cell phone and told her to call her daughter, Tavita Jynes.[FN2]

---

[2] "CT" refers to the Clerk's Transcript on Appeal.

[3] The Fifth DCA's summary of the facts in its January 21, 2010, opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the Fifth DCA.

Tavita received the call from Neal around 10:30 a.m. on the morning of June 17, 2007. Neal was crying, saying she had been kidnapped and asked for Joseph's address. Tavita asked where Neal was, but Neal could not say and someone hung up the phone. Tavita could not call back because the number was blocked. When her mother did not call back, Tavita called the police.

>   FN2. Tavita Jynes and her brother, Joseph Jynes, will be referred to by their first names to avoid any confusion to the reader.

After the phone call, Doubs began hitting Neal in the face; the beating splayed her blood on the wall of the apartment. The others in the apartment then joined in the beating, using a hammer. After she fell to the floor, Neal's hands and ankles were tied with an electrical cord and a belt.

Hollman, Doubs, and others beat Neal with "boards, guns, buckets, feet, fists, whatever they could get their hands on." Hollman stuck a gun in Neal's mouth and asked the others if he should shoot Neal. Doubs told him to wait until they had Joseph's address.

Hollman continued to beat Neal with a board, hitting her on the ankles and legs, saying, "bitch, your legs are not broken yet, they're not broken yet." Neal screamed, but this caused the people in the apartment to hit her more. At some point, Precious and another woman took Neal's rings and money.

When it became dark, Neal was taken to the bathroom in the apartment where Hollman and others ordered her to climb into the bathtub. Up to 15 people took turns coming into the bathroom and beating Neal. Both Hollman and Precious came into the bathroom several times and beat Neal. Hollman hit Neal in the head, burned her face with cigarettes, and poured salt into Neal's wounds.

Precious came in and put plastic on the floor and then asked Doubs whether they should cut up Neal and put her in the plastic or take her to a canal and shoot her. Eventually, Precious brought clothes into the bathroom and turned on the cold water in the tub. Precious told Neal to wash off the blood and put on the clothes. Precious then put a pillowcase over Neal's head.

Neal was taken out of the apartment and placed in the trunk of the car in which she had been driven from the hospital. Precious and two other women drove Neal to a canal near Kerman. The women forced Neal out of the trunk, onto the ground, and onto her knees. One of the women, Lashonda Wilkerson, pointed a gun at Neal's head. Wilkerson attempted to shoot Neal but exclaimed, "fuck I forgot the bullets" and instead began beating Neal in the head with the gun. The other two women began beating Neal, stating, "Bitch, you going to die."

Neal fell into the water and attempted to swim away while screaming for help. The three women jumped in the car, drove a short distance, and jumped into the canal. They grabbed Neal, beat her, choked her, and held her head under water. Neal acted as if she were dead and let the current carry her away.

After the three women who had attacked Neal left the area, Neal managed to crawl out of the canal. She eventually made her way to a house and knocked on the door. When no one answered, she fell asleep on the porch. Residents of the home found Neal in the morning and summoned help. One of those present noticed a number of wounds on Neal's face.

Fresno County Sheriff's Deputy Pete Garcia responded to the call, arriving at 9:43

a.m. He noticed that Neal's lips were swollen and she had lacerations to her face, around her eyes, and on her checks and forehead. Her clothing and person were very dirty. She appeared to be in pain. Neal was able to give only limited responses to Garcia's questions, but stated that she had been kidnapped and beaten in Fresno and dumped in the canal.

Neal was taken to Community Regional Medical Center, where she was treated. Neal was found to have multiple lacerations and bruises on various parts of her body. Approximately 20 minutes after Neal's arrival at the hospital, she was interviewed by Fresno City Police Officer Keith Kobashi. Neal drifted in and out of consciousness, said she was in pain, and had difficulty articulating responses.

Neal told Kobashi that two males picked her up and took her to Community Regional Medical Center, where they checked on the status of a man who had been shot. Later, she was taken to an apartment on North Diana Street, where she was told to disclose the whereabouts of her son or be killed. She called her daughter but, when Neal told her captors she did not have her son's address, they began beating her. Neal told of being beaten in the bathroom and then taken to the canal. She described the events at the canal.

Detective William Andrews arrived at the hospital around 11:00 a.m. and attempted to interview Neal, but she did not respond except to moan. Neal was given morphine, her lacerations were sutured, and she was released later that day. Andrews attempted to interview Neal that evening, but Neal was in a great deal of pain, exhausted, and kept dozing off.

Around 3:30 p.m. on June 18, 2007, Officer Keith Dooms and others began a surveillance of the apartments on North Diana Street while waiting for a search warrant. The officers saw Precious, Paulette Carter, and another woman enter and leave apartment 202 several times. After exiting the apartment, they would head to an area of the apartment complex that was out of the officers' view. Shortly after 6:30 p.m., the officers saw Carter enter apartment 202 and then exit carrying a white bleach bottle.

Carter walked out of sight of the officers. A few minutes later she emerged again, pushing a shopping cart with the two other women behind her. The other women were wearing plastic gloves. Dooms drove into the alley where the three women had headed. Dooms detained Carter, but the other women fled.

The shopping cart smelled strongly of bleach. In the cart were bloodstained pillows, several items of bloodstained clothing, bloodstained shoes, a bloodstained wash cloth, a board that appeared to have blood stains, and a broken piece of a walking cane. In the trash can was a bloodstained bottle, a cloth gun case, and an envelope addressed to Doubs.

In a search of the apartment, officers found a white T-shirt with reddish stains in the living room. In the bathroom they found a nylon belt, an extension cord, and a stained damp blue towel. The nylon belt was tied in a knot and had reddish marks. An analysis of the reddish substances and blood found on the board, bottle, blue towel, and T-shirt matched Neal's genetic profile. A search of the car used to transport Neal uncovered a claw hammer.

On June 19, 2007, Andrews interviewed Neal at her daughter's apartment. Neal was emotional, exhausted, and in pain, but apparently understood and responded to Andrews's questions. Neal provided the names of a number of her attackers, but she knew Hollman only by a nickname, "Shoot 'em."

   Andrews conducted a recorded interview of Neal on July 10, 2007. Neal identified two of her attackers as Tyren Grays and Wilkerson. Grays was arrested on July 11. Wilkerson was arrested on August 30 and gave a lengthy statement. Wilkerson named Hollman as the person Neal knew by the nickname, "Shoot 'em."

   Andrews prepared a photographic lineup and Neal identified Hollman as "Shoot 'em." Hollman was arrested on November 13, 2007.

   On November 28, Andrews received Neal's toxicology report. Andrews and the prosecutor spoke to Neal about her drug use and Neal reported using $20 to $30 worth of cocaine a day in the time leading up to the attack.

   After finally obtaining a photograph of Precious, Neal was shown a photographic lineup, including Precious's picture, on January 3, 2008. Neal identified Precious as one of her attackers and Precious was arrested on January 9.

   Hollman was interviewed by Andrews. During the interview, he stated Neal had been kidnapped. Hollman identified several people he had seen at the apartment the day Neal was assaulted. Hollman did not identify Neal from a photographic lineup and repeatedly denied being involved in the assault.

   Hollman testified in his own defense at trial. Hollman said he saw Neal at the apartment, but no one prevented Neal from leaving and Neal "could have gotten up and walked off any time she wanted." Hollman testified that while he was in the apartment he did not see or hear anyone threaten Neal; he did not see anyone beat Neal; and he did not see anyone assault Neal. Hollman also testified, however, that he did not help Neal because "it wasn't my place" and he did not want anyone to "turn on me for helping her."

People v. Hollman, No. F056701, 2010 WL 190207, at *1-4 (Cal.Ct.App. January 21, 2010).

## DISCUSSION

I. Jurisdiction

  Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lockyer v. Andrade, 538 U.S. 63, 70 (2003); Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,*

522 U.S. 1008 (1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.     Standard of Review

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624 (2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009), *quoting* Wright v. Van Patten, 552 U.S. 120, 125 (2008); see Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405, *quoting* Webster's Third New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75-76. The writ may issue only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Harrington, 131 S.Ct. at 784. In other words, so long as fairminded jurists could disagree on the correctness of the state courts decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Petitioner has the burden of establishing that the decision of the state court is contrary to

7

or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See LaJoie v. Thompson, 217 F.3d 663, 669 (9th Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v. Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003), *citing* 28 U.S.C. § 2254(e)(1). However, a state court factual finding is not entitled to deference if the relevant state court record is unavailable for the federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), *overruled by*, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

III.   Review of Claims

   A.  Testimony of Victim

In his first claim, Petitioner alleges the trial court violated his federal constitutional rights to due process, a full and fair jury trial, and the confrontation of witnesses when it issued evidentiary and procedural rulings that allowed the prosecution to cross-examine its own complaining witness and prevented the defense from performing a full and effective cross-examination of the same witness.

This claim was presented on direct appeal to the Fifth DCA which denied the claim in a reasoned decision. See Hollman, *supra*, No. F056701, 2010 WL 190207 (Cal.Ct.App. January 21, 2010). Petitioner then raised the claim to the California Supreme Court, where it was rejected without comment. (See Petition at 3.) When the California Supreme Court's opinion is summary in nature, the Court must "look through" that decision to a court below that has issued a reasoned opinion. Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991). In this case, the appellate court analyzed and rejected the claim as follows:

8

Hollman claims he was prevented from fully questioning Neal about her experience of being beaten while in the bathroom of the apartment, challenges the trial court's permitting the prosecutor to ask leading questions of Neal, contends rulings on cross-examination allowed the jury to blame him for Neal's medical condition, and asserts the trial court should have held a hearing to determine Neal's medical condition.

We disagree with Hollman's contentions. None of the trial court's rulings adversely impacted Hollman's constitutional rights. The trial court did not restrict Hollman's subject matter inquiries of Neal on cross-examination; the rulings on the mode of direct examination and cross-examination were well within the trial court's discretion; there was no requirement to conduct any medical hearing; and, alternatively, any error was harmless.

*Factual Summary*

Neal began testifying the afternoon of June 2, 2008. Early in her testimony, Neal stated that it was hard for her to be in the courtroom. Both the prosecutor and the trial court emphasized that Neal should request a break any time she needed one. Throughout the examination, Neal refused offers of a break, stating, "I just want to get it over."

Neal's direct examination resumed the morning of June 3, at which time Neal stated she was tired." Neal again declined breaks, stating, "Go. Please, just go."

Hollman's cross-examination began the morning of June 3. A break was taken at 10:25 a.m. at Neal's request. Another short break was taken at 11:25 a.m. at the prosecutor's request. The prosecutor requested the break because Neal was crying on the stand and was having a difficult time controlling her emotions. A few minutes after the break was called, outside the presence of the jury, Neal began seizing and emergency personnel were called.

Neal was crying and yelling as she was removed from the courtroom by medical personnel, who transported Neal past the room where the jury was congregated. Defense counsel expressed concern that the jury might have heard Neal. When the jury returned, the trial court told the jurors that Neal would not be testifying any further that morning because of medical concerns.

Neal was released from the hospital around 3:00 p.m. on June 3. Release instructions from the hospital indicated Neal was suffering from anxiety and had a urinary tract infection and multiple sclerosis. Neal was prescribed antibiotics and given Ativan for her anxiety. The Ativan could make her drowsy and unable to perform normal activities and the effects could last up to 20 hours.

At approximately 8:20 a.m. on June 4, John Swenning, an investigator with the district attorney's office, went to Neal's home to transport her to court. The left side of Neal's face was drooping, her eye was nearly closed, and she held the left side of her body in an unusual manner. Neal had difficulty standing and maintaining her balance. Swenning was unable to engage Neal in any conversation. The trial court informed the jury that Neal was medically unable to be present.

On June 5, Neal resumed testifying. Neal requested a short break when she started crying. Neal cried on and off during cross-examination. At one point, when defense counsel began asking a question, Neal began to "convulse and seize." The jury was excused from the courtroom, but it did observe Neal's seizure. Defense counsel asked for a mistrial, which was denied.

Trial continued on June 5 with another witness testifying. On the afternoon of June 6, Neal was scheduled to resume testifying. Before the start of her testimony, the trial court determined that a support person would be allowed to sit close to Neal, and that Precious's counsel would be allowed to proceed with cross-examination before Hollman's counsel resumed questioning Neal.

Before Neal resumed testifying, the trial court informed the jury that a support person would be present. While being cross-examined by Precious's counsel, the trial court several times told Neal she could take a break or told counsel to wait a moment before asking the next question. When Hollman's counsel resumed cross-examining Neal, the trial court told counsel on a few occasions to wait a moment before asking the next question. Neal refused to take a break, stating, "I'm not going to stop until it's over."

*Analysis*

The Sixth Amendment to the federal Constitution guarantees the defendant in a criminal prosecution the right "to be confronted with the witnesses against him." In almost identical words, the California Constitution, in section 15 of article I, also secures the right of confrontation. The primary interest protected by the confrontation guarantee is the right of cross-examination, which is "the principal means by which the believability of a witness and the truth of his testimony are tested." (*Davis v. Alaska* (1974) 415 U.S. 308, 316.) Because cross-examination implements the constitutional right of confrontation, a trial court should give the defense wide latitude to cross-examine a prosecution witness to test credibility. (*People v. Cooper* (1991) 53 Cal.3d 771, 816; *Curry v. Superior Court* (1970) 2 Cal.3d 707, 715.)

Although the defense should be accorded wide latitude on cross-examination, the trial court retains discretion to restrict cross-examination that is "repetitive, prejudicial, confusing of the issues, or of marginal relevance." *(People v. Frye* (1998) 18 Cal.4th 894, 946.) "The test for determining whether a trial court has abused its discretion in restricting defense cross-examination of a prosecution witness is whether a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*People v. Anderson* (2001) 25 Cal.4th 543, 608 (conc. opn. of Kennard, J.); see also *People v. Quartermain* (1997) 16 Cal.4th 600, 623-624.)

Neal's testimony, on both direct and cross examination, was very emotional and was aggravated by her suffering from multiple sclerosis. This created a very difficult situation for the trial court and counsel. The record shows that all involved did the best they could under the circumstances.

Hollman claims he was prevented from fully questioning Neal about her ability to see her attacker while in the bathroom and that the trial court's rulings in this regard deprived him of his constitutional rights and affected his defense. This claim, however, is not supported by the record. Hollman's questions to Neal surrounding the time in the bathroom occurred on the last day of Neal's testimony, June 6, which she completed without a break. The questions could have been answered by a "yes" or "no," but Neal gave a narrative reply. Not getting the answer he wanted, Hollman asked the same question several times. Eventually, the trial court granted a prosecution objection, and the questioning pursued another subject. The trial court did not restrict the questions Hollman could ask Neal about this aspect of her ordeal and Neal answered the questions posed to her, even if she did not do so as precisely as Hollman wished.

The trial court did exercise its discretion to control the order and mode of cross-examination, without restricting the field of questioning. The trial court is vested with

discretion, pursuant to Evidence Code section 765, to exercise "reasonable control over the mode of interrogation of a witness." (Id., subd.(a).) Because Neal was unable to discuss certain aspects of her ordeal without breaking down, the trial court exercised its discretion to control the mode of interrogation when Neal resumed testifying so that Neal's testimony could be completed. Asking counsel to pause briefly during cross-examination and asking the witness if she needed a short break, in our view, constitute reasonable control over the method of interrogation of a witness that was well within the trial court's discretion. (*People v. Bronson* (1968) 263 Cal .App.2d 831, 839-840.)

The jury was able to observe all of Neal's testimony, including the two episodes of crying and breaking down on the stand when she described being tied up, begging and screaming for help, and when she described being beaten on her legs with a board. The jury was able to observe and assess whether Neal was attempting to avoid the difficult questions on cross-examination or be evasive in her answers. The jury, as is its province, would be able to include any such assessment in evaluating Neal's credibility. (*People v. Harlan* (1990) 222 Cal.App.3d 439, 453-454.)

Hollman's claim that permitting the prosecutor to ask some leading questions of Neal adversely impacted his constitutional rights similarly fails. "Evidence Code section 767 vests a trial court with broad discretion to decide when to permit the use of leading questions on direct examination. [Citations.]" (*People v. Williams* (2008) 43 Cal.4th 584, 631.) This code section permits the use of leading questions in the interests of justice, at the trial court's discretion. Hollman has not shown that the trial court abused its discretion in permitting the prosecutor to ask a few limited leading questions of Neal, in light of Neal's obvious difficulty in testifying. Additionally, the issue is not one that rises to the level of constitutional import. Rulings of this nature are assessed for abuse of discretion by the trial court. (*People v. Spain* (1984) 154 Cal.App.3d 845, 853-854.) "While agreeing with defendant that a restriction on leading questions is important, we disagree that it is a matter of constitutional dimension." (Id. at p. 853.)

Hollman's contention that the trial court should have held an evidentiary hearing to assess Neal's medical condition is without merit. The trial court was able to assess Neal's ability to testify during her first day of testimony. Neal's breakdown on the stand necessitated medical intervention and a hospital visit. When Swenning testified regarding Neal's condition, and the trial court was provided with a copy of the hospital's release instructions, the trial court had sufficient information before it to conclude that Neal was medically unable to testify on that day. Hollman has failed to show that an evidentiary hearing on Neal's medical condition would have served any purpose.

We also do not credit Hollman's claim that the trial court's rulings somehow caused the jury to blame him for Neal's condition. It was undisputed that Neal had been subjected to a horrific assault upon her person. It is not unexpected for a victim of such an assault to be overcome with emotion when attempting to testify. Neal broke down on the stand and her testimony was halted. The trial court took steps it deemed reasonable and necessary to prevent Neal from being unable to continue testifying when she resumed the stand. The trial court never assigned any blame to defense counsel. The trial court also instructed the jury that it was not to let sympathy influence its decision and that it was to decide the case solely upon the evidence presented. Presumably, the jury followed these instructions. (*People v. Cruz* (2001) 93 Cal.App.4th 69, 74 .)

Finally, any rulings regarding the direct and cross-examination of Neal are harmless. The issue was not whether Neal had been subjected to a vicious assault. The issue was whether Hollman was one of those responsible for the assault on Neal. Hollman was placed in the apartment by two other witnesses during the time Neal was assaulted. Joaquinna McCoy saw Hollman come from the back of the apartment right after hearing

11

1  Neal scream as though in great pain. Wilkerson was identified by Neal as one of her
2  attackers. Wilkerson in turn identified Hollman as one person involved in the attacks on Neal and who was known to Neal only by a nickname.

3  Hollman also testified that he was in the apartment when Neal was present, but
4  that it was not his place to help Neal and that Neal was free to leave at any time. The jury certainly was free to assess Hollman's credibility and accept his testimony that he was
5  present at the apartment, while rejecting his testimony that he did not partake in the attack against Neal.

6 Hollman, No. F056701, 2010 WL 190207, at *4-8.

7  The Confrontation Clause of the Sixth Amendment gives a defendant the right "to be
8 confronted with the witnesses against him." U.S. Const. amend. VI. This right extends to
9 defendants in state as well as federal criminal proceedings. Pointer v. Texas, 380 U.S. 400
10 (1965). "Confrontation means more than being allowed to confront the witness physically."
11 Davis v. Alaska, 415 U.S. 308, 315 (1974). "'[T]he main and essential purpose of confrontation
12 is *to secure for the opponent the opportunity of cross-examination*.'" Id., at 315-316, *quoting* 5 J.
13 Wigmore, Evidence § 1395, p. 123 (3d ed. 1940) (emphasis in original); Douglas v. Alabama,
14 380 U.S. 415, 418 (1965). Nevertheless, "the Confrontation Clause guarantees only 'an
15 opportunity for effective cross-examination, not cross-examination that is effective in whatever
16 way, and to whatever extent, the defense might wish.'" Kentucky v. Stincer, 482 U.S. 730, 739
17 (1987), *quoting* Delaware v. Fensterer, 474 U.S. 15, 20 (1985). Further, "trial judges retain wide
18 latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such
19 cross-examination based on concerns about, among other things, harassment, prejudice,
20 confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally
21 relevant." Delaware v. Van Arsdell, 475 U.S. 673, 679 (1986).

22  In this case, the trial court exercised appropriate discretion in a very difficult and delicate
23 situation. The record shows the victim suffered from multiple sclerosis, anxiety, and a urinary
24 tract infection, and was clearly emotional and in great pain from her ordeal. In fact, she was
25 medically unable to testify at one point during trial and her testimony had to be postponed.
26 Given the victim's emotional breakdowns and medical issues, the trial court exercised sound
27 discretion in asking defense counsel to pause during questioning and in asking the witness if she
28 needed a break. In addition, the trial court properly sustained an objection of "asked and

answered" after defense counsel repeatedly asked the same question. With respect to the trial court's decision to continue the victim's testimony to a following date because of her medical issues, the decision was not unreasonable. The trial court possessed all necessary information to make this ruling, including witnessing her behavior firsthand, possessing the hospital release instructions, and hearing testimony from an investigator regarding the victim's condition. An evidentiary hearing was unnecessary. The trial court also properly allowed the prosecutor to ask limited leading questions given her difficulties in testifying. In sum, Petitioner fails to demonstrate that the trial court in any way violated his constitutional right to confront the witness.

As to any argument that the victim's own physical impairments prevented effective cross-examination, he fails to demonstrate a violation of his constitutional rights. The Ninth Circuit stated in Vasquez v. Kirkland, 572 F.3d 1029, 1031 (9th Cir.2009),

> Because there is no factually analogous Supreme Court decision finding a confrontation clause violation on the basis of the witness's own physical impairments, the California Court of Appeal's decision affirming Vasquez's conviction is not contrary to a Supreme Court decision. . . ."

The result is the same in this case.

Petitioner fails to demonstrate that the state court rejection of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). The claim must be denied.

B.   Juror Contact Information

In his second ground for relief, Petitioner claims the trial court abused its discretion in denying the defense permission to contact jurors in order to investigate possible juror misconduct as to the possibility that a juror had a close relationship with an investigator who had attended one day of trial. Petitioner also sought permission to contact jurors regarding any impact the victim's emotional breakdowns had on the jury.

Petitioner also presented this claim on direct appeal to the Fifth DCA where it was rejected in a reasoned decision. The claim was also presented to the California Supreme Court

and denied without comment. As previously stated, when the California Supreme Court's opinion is summary in nature, the Court must "look through" that decision to a court below that has issued a reasoned opinion. Ylst, 501 U.S. at 804-05 & n. 3. The Fifth DCA analyzed the claim as follows:

> Hollman contends the trial court erred when it denied his request for juror contact information. Specifically, he asserts he was entitled to juror contact information in order to determine (1) whether the jury heard and discussed Neal's loud cries in the hallway outside the jury room when she was removed from the courtroom by medical personnel, and (2) whether Juror No. 6 had a close relationship with an investigator in the district attorney's office who had attended one day of the trial.
>
> Denial of a request for access to confidential juror information is reviewed under the deferential abuse of discretion standard. (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 991 (*Carrasco* ).) Hollman has failed to establish that good cause existed pursuant to Code of Civil Procedure section 237 for the release of juror contact information and therefore has failed to demonstrate that the trial court abused its discretion in denying his request.
>
> Hollman's request for juror contact information to question jurors on whether they factored into their deliberations Neal's cries as she was taken from the courtroom by medical personnel can best be described as a fishing expedition. Hollman had virtually no evidence indicating the jury heard Neal's cries while it was in the jury room behind closed doors or that it factored this information into its deliberations. The jury was instructed that it was not to consider sympathy for any person or extraneous information in its deliberations, but to decide the case based upon the evidence presented, including the emotional state of Neal while testifying. We see nothing in the record before us to indicate the jury did not follow the trial court's instructions. We presume jurors faithfully followed and applied the instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)
>
> The request for juror contact information based upon an alleged close relationship between Juror No. 6 and an investigator in the district attorney's office also was properly denied. The only information put forth to support this basis for release of juror contact information was a declaration from defense counsel. In that declaration, defense counsel stated that he had been told by the prosecutor that Juror No. 6 "and her family may have a close relationship" with an investigator. The prosecutor "was given" this information after the investigator sat in as a spectator for one day of the trial.
>
> Defense counsel's declaration is double hearsay-the information comes from the prosecutor by way of an unnamed third party. Hearsay does not trigger any duty on the part of the trial court to investigate or release juror contact information. (*People v. Avila* (2006) 38 Cal.4th 491, 605.) Because the trial court had before it only hearsay, there was no evidence Juror No. 6 and the investigator had any "close relationship" or the nature of that relationship, i.e., neighbors, family friends, etc. There also was no evidence presented that Juror No. 6 and the investigator had at any time discussed Hollman's case or engaged in any conduct that would constitute juror misconduct. Hollman could have contacted the investigator to obtain particulars about any alleged relationship or connection to Juror No. 6, but apparently did not. (*People v. Jones* (1998) 17 Cal.4th 279, 317.)
>
> Based on the evidence, or lack thereof, before it, the trial court properly denied the request for disclosure of juror contact information. (*Carrasco, supra,* 163 Cal.App.4th at p. 991.)

Hollman, No. F056701, 2010 WL 190207, at *8-9.

"In all criminal prosecutions," state and federal, "the accused shall enjoy the right to . . . trial . . . by an impartial jury," U.S. Const. amends. VI and XIV; see Duncan v. Louisiana, 391 U.S. 145 (1968). Nevertheless, the Court is mindful of the fact that "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Rushen v. Spain, 464 U.S. 114, 118 (1983), *quoting* Smith v. Phillips, 455 U.S. 209, 217 (1982). "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." Smith, 455 U.S. at 217.

Here, Petitioner contends the trial court should have provided the defense with juror contact information to explore an alleged relationship between a juror and an investigator who attended one day of trial. The state court reasonably rejected the request. As discussed by the appellate court, there was no reliable evidence on which to base the request. The only evidence came from a declaration from defense counsel that stated defense counsel had been told by an investigator that a juror "may have a close relationship" with an investigator. Hollman, No. F056701, 2010 WL 190207, at *9. First, the statement was double hearsay. Second, the source is completely unknown. Third, there is nothing in the statement which demonstrates a potentially problematic relationship existed; indeed, the declarant is not even certain a relationship even existed let alone that the relationship rose to the level of juror misconduct. Granting juror contact information would have facilitated what can only be characterized as a fishing expedition.

Likewise, the trial court properly denied the request for juror contact information to explore the effect, if any, that the victim's emotional outbursts had on the jury. There was simply no evidence that the jury heard the victim's cries, or that they had any effect on the jury. Moreover, the Court is unaware of any Supreme Court authority which would require disclosure of juror contact information to explore the effect on a jury of a witness's cries as she is taken out of a courtroom.

Petitioner fails to demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." The claim must be rejected. 28

U.S.C. § 2254(d).

### C. Sentence

In his third and final ground for relief, Petitioner claims the trial court violated his constitutional rights by selecting a longer term of imprisonment based on his failure to plead guilty.

As with his previous two claims, Petitioner presented this claim on direct appeal to the Fifth DCA and California Supreme Court. The Court considers the Fifth DCA opinion as it is the last reasoned decision. Ylst, 501 U.S. at 804-05 & n. 3. The appellate court rejected the claim as follows:

> Hollman contends the trial court violated his constitutional right by imposing a harsher sentence because he refused to plead guilty. Hollman is mistaken.
>
> ***Factual Summary***
>
> Prior to the commencement of voir dire, the trial court granted a motion to sever the case of another codefendant, Tamika Anderson, from the case. With Anderson, Precious, Hollman and their counsel in the courtroom, the trial court made the following statement:
>
> "And I will just simply share for everyone's benefit before the panel gets here, that someone said a long time ago that the first step towards rehabilitation is an acknowledgement towards responsibility. And that goes quite heavily as far as this Court is concerned, if there's an acknowledgement of responsibility that weighs heavily in this Court's view in terms of sentence."
>
> Anderson and her counsel were excused from further participation in the proceedings. Shortly afterwards, the trial court made the following statement:
>
> "But I will state that this is your last chance to resolve the case, if you want to do so before the panel arrives, which should be very shortly. But if you choose not to, that's perfectly your decision. But this is a case that has serious consequences. And I don't think anybody should be misled as to what they think, if there's a conviction, what the sentence will be, because at that point it will be entirely in the Court's hands. There's many, many counts here that can be run consecutively and concurrently and so on, as I broached to Ms. Anderson, who is no longer in the case."
>
> The trial court went on to state that if Hollman was "not satisfied with the offer the People made that was the lynch pin of this, there's nothing to preclude him from making a counteroffer." Precious's counsel stated that Precious had been willing to enter into a resolution of the case with the district attorney's office for several weeks but was unable to do so because the offer was "a package offer," and the district attorney's office was unwilling to "break the package." The trial court responded, "that's a matter between Counsel in terms of offers and acceptance and package offers and so on."

The probation report noted that Hollman was on felony probation at the time Neal was assaulted and tortured. The probation officer found no circumstances in mitigation and several circumstances in aggravation. The recommendation was that Hollman receive a determinate term of seven years eight months, plus an indeterminate life term on count 1 (torture).

During sentencing, the trial court commented that Precious, to her "credit she was willing to accept the offer extended by the People. But unfortunately for her it was a package disposition, which Defendant Hollman held up."

After Hollman's counsel argued that Hollman should receive the same sentence of two to seven years in prison that other defendants involved in the incident received, the trial court commented that "with reference to the arguments about uniformity of sentencing and two to seven years in prison that the others are serving, as I indicated during my questioning of Defense Counsel, all of those individuals did accept responsibility and pled. And I think that their plea reflects a factor in mitigation that I'm sure the sentencing court in those situations took into consideration with reference to the sentence that was given to the other participants."

Ultimately, the trial court imposed a life term on the torture count and a determinate term of seven years for the other counts, eight months less than the probation report recommendation. In imposing sentence, the trial court commented, "And the Defendant at this time, and apparently by virtue of all the Court has heard, doesn't show any demonstration of remorse whatsoever."

*Analysis*

The party attacking a sentencing decision bears the burden of showing the trial court relied upon an improper factor or made an arbitrary choice. (*People v. Superior Court ( Alvarez )* (1997) 14 Cal.4th 968, 977.) Although Hollman contends the comments made by the trial court as set forth above indicate that the trial court improperly imposed a harsher sentence because he refused to plead guilty, the record contains no evidence that the trial court imposed a sentence based upon Hollman's decision to stand trial.

Viewed as a whole and in context, the trial court's reference to the failure to accept a plea or to accept responsibility and demonstrate remorse simply was an observation that Hollman had lost a mitigating factor that the law would otherwise allow a sentencing court to consider in making sentencing choices. (Cal. Rules of Court, rule 4.423(b)(3); *In re Lewallen* (1979) 23 Cal.3d 274, 281 [under appropriate circumstances a defendant may receive a more severe sentence following trial than he would have received had he pled guilty].)

In imposing the sentence it did, the trial court noted that it had read and considered the probation report, including attached letters from Hollman and one of his friends. The trial court then commented on Hollman's prior criminal record, stating "this is not his first appearance before the justice system" and noted that Hollman was on felony probation at the time of the offenses. The trial court also noted Neal "was nearly beaten within an inch of her life"; the pain and suffering Neal "incurred is unimaginable"; and the photographs taken of her speak "quite loudly in terms of the beating and torture" she suffered. The trial court further noted that the offenses against Neal were "not an impulsive act" but a "well thought-out plan" involving "hours, and hours, and hours of torture."

Nothing in this record suggests that the trial court imposed a harsher sentence because Hollman chose to go to trial. (*People v. Angus* (1980) 114 Cal.App.3d 973, 989-

990 ["There must be some showing, properly before the appellate court, that the higher sentence was imposed as punishment for exercise of the right"].) On the contrary, the trial court based its sentencing decision on articulated facts in aggravation, ultimately imposing a sentence that was slightly lower than that recommended in the probation report. There was no error.

Hollman, No. F056701, 2010 WL 190207, at *9-11.

As correctly stated by Respondent, the Supreme Court has stated that with regard to leniency and guilty pleas:

[T]here is no *per se* rule against encouraging guilty pleas. We have squarely held that a State may encourage a guilty plea by offering substantial benefits in return for the plea. The plea may obtain for the defendant "the possibility or certainty . . . [not only of] a lesser penalty than the sentence that could be imposed after a trial and a verdict of guilty . . . .," Brady v. United States, 397 U.S. 742, 751, 90 S.Ct. 1463, 1470, 25 L.Ed.2d 747 (1970), but also of a lesser penalty than that *required* to be imposed after a guilty verdict by a jury. In Bordenkircher v. Hayes, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), the defendant went to trial on an indictment charging him as a habitual criminal, for which the mandatory punishment was life imprisonment. The prosecutor, however, had been willing to accept a plea of guilty to a lesser charge carrying a shorter sentence. The defendant chose to go to trial, was convicted, and was sentenced to life. We affirmed the conviction, holding that the State, through the prosecutor, had not violated the Constitution since it "no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution." Id., at 365, 98 S.Ct., at 669.

Corbitt v. New Jersey, 439 U.S. 212, 218-20 (1978).

Moreover, the Supreme Court stated that its precedents "unequivocally recognize the constitutional propriety of extending leniency in exchange for a plea of guilty and of not extending leniency to those who have not demonstrated those attributes on which leniency is based." Id. at 224.

In this case, Petitioner was not extended the same leniency as those who defendants who pled guilty. This is in accord with Supreme Court precedent. There is no evidence of any retaliation or vindictiveness against Petitioner for opting to go to trial. As noted above, the trial court considered all sentencing factors in aggravation and mitigation and rendered a sentence slightly lower than that recommended in the probation report.

Petitioner cannot demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." This claim must also be rejected. 28 U.S.C. § 2254(d).

**CERTIFICATE OF APPEALABILITY**

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
>     (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
>     (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

///

/

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. The Petition for Writ of Habeas Corpus is DENIED WITH PREJUDICE;

2. The Clerk of Court is DIRECTED to enter judgment; and

3. The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

**Dated:   September 28, 2011**              /s/ Sandra M. Snyder
                                     UNITED STATES MAGISTRATE JUDGE